# MAY, 1909.

REAGAN ROUND BALE COMPANY ET AL. V. DICKSON CAR WHEEL COM-
PANY.

Decided May 1, 1909.

**1.—Trial—Undisputed Evidence—Submission of Issue.**

When the evidence upon an issue is without conflict and undisputed, it may
be reversible error for the trial court to submit such issue as a question for the
jury to pass upon.

**2.—Same—Contract—Performance—Time as Essence of Contract.**

In a suit for the contract price of machinery manufactured and delivered
by plaintiff to defendant, defendant plead in reconvention that plaintiff failed
to deliver the machinery within the time stipulated in the contract, that the
machinery was intended for use during a certain season, that time was of the
essence of the contract, and that plaintiff knew that unless the machinery was
delivered as stipulated in the contract defendant would suffer loss, evidence
considered and held to sustain defendant's contention without conflict, and it was
therefore error for the trial court to submit said issues to the jury.

**3.—Contract—Breach—Waiver—Alternative Remedies.**

When a contract provided for the delivery of certain machinery before
a certain date, upon failure of the contractor to deliver the machinery within the
time specified, the other party to the contract might refuse to receive the
machinery tendered after the date specified when time is of the essence of the
contract; but a failure to exercise this right would not defeat his right to recover
damages for delay in the delivery.

**4.—Special Charge—Omitting Issues—Refusal.**

It is proper to refuse a special charge which makes the case hinge upon a
single issue when other material issues are raised by the evidence.

**5.—Same—Same—Loss of Profits as Damages.**

When the probable amount of profits which a party expects to realize from
the performance of a contract can be shown with reasonable certainty, and their
loss in case of breach was in contemplation of parties at the time the contract
was made, the loss of such profits may be recovered as damages in case of breach
of the contract.

**6.—Contract—Warranty—Breach or Performance—Irrelevant Evidence.**

An original contract provided that certain machines should be made in a
certain way and of certain materials; upon delivery of the first machine the
contract was changed by agreement of the parties so as to stipulate that the
remaining machines should be made in exact accordance with the first or sample
machine. Held, the only proper test of the performance or breach of the
contract as to the machines thereafter made was whether or not they were in
accordance with the sample machine, and the testimony of an expert mechanic,
who had not seen the sample machine, to the effect that said machines were not
skilfully made, was properly excluded as irrelevant and immaterial.

**7.—Same—Construction—Interdependent Provisions.**

When a contract provided that certain articles were to be manufactured
and delivered in installments and payment was to be made as the installments

were delivered, and that the last delivery and payment were to be made by a certain date, the agreement to make payment must be held to have been made with reference to the agreement to deliver, and in case of a failure to deliver or of a readiness to deliver on the date named, the payment would not bear interest from said date but only from the date when the delivery or tender of delivery was in fact made.

### 8.—Same—Breach—Uncertain Profits—Evidence.

Upon the issue of damages for failure to deliver a cotton press by a certain time, the testimony of a witness that but for the delay he would "possibly" have ginned "a thousand or two" more bales was properly excluded because too indefinite and uncertain to form any basis for a reasonable estimate of the number of bales that were lost by the delay. The statement, however, of the witness that the loss in bales was not less than one thousand was not subject to such objection.

Appeal from the Sixty-first Judicial District, Harris County. Tried below before Hon. Norman G. Kittrell.

*Bryan & McRae, Ogden, Brooks & Napier* and *Swearingen & Tayloe,* for appellants.

*Baker, Botts, Parker & Garwood,* for appellee. *C. L. Carter* and *Jesse Andrews,* of counsel.—The profits for the loss of which the defendant sued were so uncertain, speculative and conjectural that they could not constitute a basis for allowing damages. And the court, by instructing the jury upon a given finding to return a verdict for the defendant for damages on account of the profits gave a more favorable instruction to the defendant than it was entitled to. Stell v. Paschal, 41 Texas, 640; Stark v. Alford, 49 Texas, 260; Chatham v. Jones, 7 S. W., 600; Alamo Mills Co. v. Hercules Iron Works, 22 S. W., 1097; Fraser v. Echo Mining & Smelting Co., 28 S. W., 714; Varner v. Dexter Gin, etc., Ass'n, 39 S. W., 237; Schropshire v. Adams, 89 S. W., 448; Howard v. Manufacturing Co., 139 U. S., 199; Griffin v. Colver, 16 N. Y., 489.

PLEASANTS, CHIEF JUSTICE.—This suit was brought by appellee against the appellant and the Reagan Bale Company to recover the sum of $28,781.25 alleged to be due upon a contract for the manufacture by appellee of thirty Reagan Automatic Round Bale Systems, and the further sum of $2,234.81 for supplies and extras furnished appellants by appellee for use in the operation of said "system." The contract sued on, which is attached to plaintiff's petition, is as follows:

"State of Texas, County of Bexar.

"This agreement, made the twenty-ninth (29th) day of May, A. D. 1906, by and between the Reagan Round Bale Company of San Antonio, Texas, party of the first part, hereinafter designated the 'owner,' and Dickson Car Wheel Company, of Houston, Texas, party of the second part, hereinafter designated the 'manufacturer':

"Witnesseth: That the owner, in consideration of the fulfillment of the agreement herein made by the manufacturer, agrees with the said manufacturer as follows:

"Art. 1.   The manufacturer shall and will provide all the material and perform all the work mentioned in the specifications and shown on the drawings, which drawings and specifications are identified by the signatures of the parties hereto, and are marked Exhibits 'A' to '—' inclusive, and attached to this contract: The said drawings and specifications describe the Reagan Complete Automatic Round Bale System, consisting of the condenser, auxiliary press, main press and the fittings.   The fittings are a sheet-iron conveyor from the condenser to the auxiliary press, described fully in the drawings and specifications above referred to; a conveyor from the auxiliary press to the main press, pump, tank, accumulator, lubricator, compression grease cups, valves, pipes, levers, pulleys and L-beam, fully described in the said drawings and specifications.   The drawings herein mentioned are those made by the manufacturer and accepted by the owner.

"Art. 2.   The owner shall furnish to the manufacturer such further drawings and explanations as may be necessary to detail and illustrate the work to be done, and the manufacturer shall conform to the same as part of this contract, so far as they may be consistent with the original drawings and specifications referred to and identified, as provided in article 1, and may not impose an additional cost or expense upon the manufacturer.   It is mutually understood and agreed that all drawings and specifications are to remain the property of the owner.

"Art. 3.   No alterations shall be made in the work shown or described by the drawings and specifications, except upon a written order of the owner, accepted in writing by the manufacturer, and when so made and accepted, the value of the work added or omitted shall be computed and the amount agreed upon shall be added to or deducted from the contract price.

"Art. 4.   The manufacturer shall build thirty (30) Reagan Complete Automatic Round Bale Systems, with all fittings, as specified in article 1.   The manufacturer shall complete the several portions and the whole of the work comprehended in this agreement by and at the time or times hereinafter stated, viz.:   On or before the first day of June, 1906, the manufacturer shall deliver f. o. b. cars, Houston, Texas, five (5) complete systems, with all the fittings, f. o. b. cars; on or before the fifteenth day of June, 1906, five (5) complete systems with all the fittings f. o. b. cars Houston, Texas; on or before the first day of July, 1906, five (5) complete systems, with all the fittings, f. o. b. cars, Houston, Texas; on or before the fifteenth day of July, 1906, ten (10) complete systems, with all fittings, f. o. b. cars, Houston, Texas; on or before the first of August, 1906, five (5) complete systems, with all fittings, f. o. b. cars, Houston, Texas; it is expressly agreed and understood that each and every system shall be assembled and tested in the shops of the manufacturer at Houston, Texas, and delivered f. o. b. cars there.   The said tests shall demonstrate that the material and workmanship are according to this contract, and that all the fittings assemble properly, all pinions, gears and meshes work properly, and that the entire machine will run smoothly, and that all fittings, bearings and packings are true and tight.

"Art. 5. Should the manufacturer be obstructed or delayed in the prosecution or completion of his work by the act, neglect, delay or default of the owner, or any other manufacturer employed by the owner upon the work, or by any damage which may happen by fire, lightning, earthquake or cyclone, or by any abandonment of the work by the employes, or by failure to procure the necessary tools or materials, through no default of the manufacturer, then the time fixed herein for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all of the causes aforesaid, but no such allowance shall be made unless a claim therefor is written and mailed to the owner within forty-eight (48) hours of the occurrence of the delay.

"Art. 6. It is hereby mutually agreed between the parties hereto that the sum to be paid by the owner to the manufacturer for said work and material shall be forty-six thousand and fifty dollars ($46,050), subject to additions and deductions as hereinabove provided, and that such sums shall be paid in current funds by the owner to the manufacturer in installments, as follows: Five thousand seven hundred fifty-six and twenty-five one-hundredths dollars ($5,756.25), to be paid on the signing of this contract; five thousand seven hundred fifty-six dollars and twenty-five one-hundredths ($5,756.25) to be paid on the fifteenth day of June, 1906; five thousand seven hundred fifty-six and twenty-five one-hundredths dollars ($5,756.25) to be paid on the first day of July, 1906; eleven thousand five hundred twelve dollars and fifty one-hundredths ($11,512.50) to be paid on the first day of August, 1906; the above payments shall be made contemporaneously with the delivery of the last system due on the dates when the payments are due. The final payment of five thousand seven hundred fifty-six and twenty-five one-hundredths ($5,756.25) shall be made on or before September 1, 1906.

"Art. 7. The owner agrees to hold the manufacturer harmless from any and all suits or claims, including judgments, court costs or expenses connected therewith, based on the alleged infringements or infringement of the patent rights or patents of the third parties.

"Art. 8. The said parties for themselves, their heirs, executors, administrators, assigns and successors, do hereby agree to the full performance of the covenants herein contained.

"In witness whereof the parties have hereunto set their hands and seals in duplicate, this the 29th day of May, 1906.

(Signed)          "Reagan Round Bale Company,
                  "By P. H. Swearingen, Pres.
(Signed)          "Dickson Car Wheel Company,
                  "By John F. Dickson, President."

The petition alleges a compliance with said contract on the part of plaintiff, and the failure and refusal on the part of the defendants to receive nine of said systems and pay a balance of $28,781.25 due upon said contract, and the further sum for extras and supplies before mentioned. It is also alleged that the Reagan Bale Company has by purchase acquired all of the assets of the Reagan Round Bale Company and has assumed all of its debts and liabilities.

The defendant Reagan Round Bale Company answered by general and special exceptions and general denial, and specially answered, in substance, that plaintiff had failed to comply with its contract for the construction and delivery of said systems on the dates named in the contract, and the defendant had been damaged by the loss of the use of said systems during the cotton ginning season of 1906 in the sum of $75,000; that the twenty-one systems which were received by defendant under said contract were not constructed in accordance with the contract, and were not worth the price agreed to be paid therefor and which had been paid by defendant, the reasonable value of said systems being $4,265.75 less than the sum defendant had paid plaintiff therefor; that by reason of the delay in the delivery of said systems and the failure of the plaintiff to construct same of the material and in accordance with the requirements of the contract, defendant had been further damaged in the loss of time of its engineering force and in additional labor and mechanical power necessary in installing and operating said systems in the sum of $3,000; that plaintiff had failed to furnish certain pulleys, shaftings, belting, valves and other fittings required under said contract to make the systems complete, which defendant had to supply at a cost of $8,290, and that plaintiff failed to furnish the drawings as required by said contract, which drawings were reasonably worth the sum of $1,000, and had also failed to return to defendant certain patterns of said systems which belong to defendant and are worth the sum of $2,100.

It is averred that plaintiff at the time of entering into the contract was fully informed of the use to which the systems were to be put by the defendant, and of the necessity for a strict compliance with the contract provisions as to the time of the completion and delivery of said systems, and knew that defendant would likely suffer the damage claimed by it if said systems were not completed by the time specified in the contract. All of the above items of damage, aggregating a total of $93,655.75, are pleaded as a counterclaim against plaintiff's demand, and in reconvention, and judgment is asked against plaintiff for said amount.

The defendant Reagan Bale Company filed answer admitting that it had purchased all of the assets of its codefendant and had assumed its liabilities, and adopted as its answer the answer of the Reagan Round Bale Company.

The plaintiff filed supplemental petition in reply to defendant's answer, in which it admits the delay charged by defendant in the completion and delivery of said systems, but alleges facts which excuse such delay under the provisions of section five of the contract before set out. It specially denied the averments of the defendant's answer as to the defective material and construction of said systems, and each and all of the several claims of damage set up in said answer. It further alleged that defendant had expressly waived any claim it might have for damage for delay in the construction of said systems or for defective workmanship and material used in such construction. Attached to this supplemental petition as an exhibit is the following letter:

"Houston, Texas, July 7, 1906.
"Dickson Car Wheel Co.,
     "Houston, Texas.

"Gentlemen: After careful examination and inspection of the main press, auxiliary, condenser, pump, tank, accumulator and other fittings attached immediately thereto, all of which go to make up one complete system, with the exception of the countershaft, main-line shafting, pulleys, belting and boxes attached thereto, which parts are under discussion as to which of the two parties signing the existing contract is to furnish the material in question, we beg to advise that we hereby accept said system as being in accordance with the contract drawn up between your company and ourselves.

"It is understood that the matter of liability for the parts above referred to is to be adjusted at some other time, as it is not intended to hold the presses here on account of this difference.

"The system which we are today accepting is a finished sample, numbered 130, and is a complete outfit according to the contract, with the above exceptions as to additional parts. The balance of twenty-nine complete systems is to be finished in exact accordance with the system above referred to, with the exceptions heretofore stated.

"It is further understood that as you have tested these machines by belting them up and putting a low pressure on the cylinder and similar parts, we are further willing to receive the systems and ship them out as rapidly as they can be completed, and waive our right of thoroughly testing each system at your factory, provided that you will be responsible for all breaks, defective castings and defective workmanship and damage caused by said breaks to the system in the first day's run at the several gin houses, and it is further understood that only competent men shall make these tests, we reporting to you said tests of the first day's run as rapidly as each is made. It is further understood and agreed that no further changes are to be made on the systems now furnished and under construction.

"We, as representatives of the Reagan Round Bale Company, hereby accept the complete automatic system No. 130 as a sample system, the difference above mentioned to be decided later, which shipment is now finished and ready for shipment. It is understood that this does not alter or change the original contract except as herein stated.
                         "Respectfully submitted,
                              "Reagan Round Bale Co.,
                                   "Per Wm. C. Lott.
"Accepted by Dickson Car Wheel Co.,
     "John F. Dickson, President."

The trial in the court below was by a jury, and resulted in a verdict and judgment in favor of plaintiff for the sum of $28,781.25, balance due on the contract, with interest at six percent from September 1, 1906, and the further sum of $1,234.81 for extras and supplies furnished defendants, with interest from January 1, 1907, at six percent, and in favor of defendants for $700, value of drawings, and for recovery of the nine systems in possession of plaintiff.

In view of the conclusion we have reached as to the proper disposi-

tion of this appeal it will be unnecessary to make a full finding of facts disclosed by the record, and we shall only set out, in discussing the questions considered in this opinion, the facts necessary to elucidate the several points decided.

Under appropriate assignments the appellant complains of the charge of the court in that it submits as issues to be determined by the jury the questions of whether time was of the essence of the contract sued on, and whether plaintiff knew at the time the contract was entered into that unless it made delivery of the presses on the several dates named in the contract defendant would likely suffer loss by such failure of delivery; and in this connection complaint is also made of the refusal of the court to give a special charge requested by defendant which instructed the jury in effect that time was of the essence of the contract, and that unless the plaintiff was excused from making said deliveries on the dates named in the contract under article V of said contract before set out, defendant would be entitled to recover such damages as the jury might find under the charge given by the court. The paragraphs of the court's charge of which this complaint is made, and the special charge requested by the defendant above referred to, are as follows:

"XVIII. As to the claim for damages for loss of profits in not being able to handle more round bales of cotton, you are instructed as follows:

"Defendant says that plaintiff knew when it made the contract to deliver at the times named therein that defendant intended to install and use the systems within a certain limit of time, and knew that unless it was able to install and use the machines within the time named for delivery defendant would suffer loss, and that plaintiff was advised that said dates of delivery were fixed with a view to such use, and that thereby defendant would make profits which it could not make if delivery was not made until a later date; and defendant alleges that 'time was of the essence of the contract,' which means that plaintiff was so advised when it contracted as to time of delivery that in reasonable probability loss would be suffered by defendant by delay in delivery in the way of profits, which it alleges plaintiff knew was in contemplation of both parties when the contract was made.

"XIX. Whether the plaintiff knew when the contract was made that, unless delivery was made at the time named, defendant would likely suffer loss, and whether the plaintiff made the contract in contemplation of such loss of profits by defendant, if it (plaintiff) failed to deliver the systems according to contract, is for you to say from all the evidence.

"XX. If you find that it did so contract with the knowledge that unless delivery was made as contracted to be made, defendant would probably suffer loss of profits by reason of inability to handle as many bales of round cotton as it would handle if delivery was made according to contract, and if you find that the failure, if any, of the defendant to handle more cotton was due to a breach of contract on the part of the plaintiff, then you will inquire what loss, if any, defendant sustained in that regard."

Special charge No. 9, the refusal of which is complained of, is as follows:

"You are instructed that under the terms of the contract of May 29, 1906, the plaintiff obligated itself to deliver to the defendant Reagan Round Bale Company five complete systems, with all fittings, on or before the 1st day of June, 1906; five complete systems, with all fittings, on or before the 15th day of June, 1906; five complete systems, with all fittings, on or before the 1st day of July, 1906; ten complete systems, with all fittings, on or before the 15th day of July, 1906; and that said terms of said contract obligated the plaintiff to deliver said systems in the order and in the times mentioned in said contract; and if you believe from the evidence that the defendant Reagan Round Bale Co. was damaged by reason of the failure of the plaintiff to deliver said systems on or before the days mentioned, then you will find for the defendants for such damage as you find under the charge of the court, if any, were sustained by reason of such delay, unless you further find that it was agreed between plaintiff and defendant Reagan Round Bale Co. that steel-drawn tubing should be substituted for XX pipe for the guides for the main press, and that the plaintiff was unable to secure such tubing in time to comply with such contract, and that said delay was caused by reason of its inability, if any, to secure such tubing."

The original and preliminary contract between the parties for the construction of these presses was entered into on April 27, 1906, and contained no clause limiting appellee's liability for failure to complete and deliver the presses on the dates named in the contract. This contract is as follows:

"This is only a memorandum of an agreement to be executed by and between the Reagan Round Bale Company of San Antonio, Texas, and the Dickson Car Wheel Company of Houston, Texas.

"The contract is to embrace, among other things, the following: The Dickson Car Wheel Company agrees to build thirty (30) of the Reagan Complete Automatic Round Bale Systems, which include a press, like the one now in Lange's gin, built by the Dickson Car Wheel Company during the year of 1906, with certain changes already discussed and agreed upon; one auxiliary press similar to the one at Lange's gin, built by the Alamo Iron Works during the year 1906, with certain changes already discussed, and one condenser similar to the one built by the Alamo Iron Works, and now in Lange's gin, with certain changes already discussed.

"These are to be delivered complete, including all the fittings and attachments, similar to the one now on system at Lange's gin, f. o. b. Houston, Texas, beginning on the first day of June, and all are to be delivered before the first day of August, 1906.

"The Reagan Round Bale Company agrees to pay for the same the sum of $1,535 for each system, which includes one of each of the above-mentioned machines, to be paid as follows: "$5,000 are to be paid on the 15th day of May, 1906, and seventy-five (75) percent of the purchase price to be paid on receipt of each system, f. o. b. cars, Houston, Texas, the remaining twenty-five (25) percent to be paid September 1, 1906.

"It is further agreed that drawings and blue prints are to be made of the machines, including all the changes already discussed, which will be O. K.-ed by both parties and attached to the contract, and to be made a part thereof.

"This is a memorandum only, and is to be replaced by a contract to be agreed upon embracing the elements herein mentioned. The usual 'strike clause' is to be inserted in the contract."

John F. Dickson, Jr., plaintiff's assistant general manager, and a witness for plaintiff, testified:

"We represented to the Reagan Round Bale people that we were prepared to undertake a contract for the prompt delivery of these machines, and that our shop was equipped for that purpose, to make prompt deliveries. All that was mentioned in the agreement of April 27th relative to the obligation to deliver the thirty presses was the usual strike clause. We believed when we signed the contract of May 29th that we would be able to comply with that contract. We knew the purposes for which these machines were being built. We constructed in our shop the only two machines that were ever built. We knew it was the purpose and desire of the Reagan Round Bale people to install them and use them on the cotton crop of 1906, and for that reason the date of delivery was fixed to begin on the 1st of June.

"They did not say, in effect, that the bid of the Union Iron Works was $7,000 less than my bid, but that they would give it to me only on the ground that I could get it out in June and July, and that the Union Iron Works could not; they said that while they wanted to favor the Texas manufacturers—the Southern manufacturers—that it would go to Chicago or St. Louis if we did not take it; they said that we were the only shop in Texas that could handle it.

"I suppose it was the intention to make a profit out of these presses, and it would be a natural conclusion that they expected to realize a profit and use them in the cotton season of 1906. I didn't know the detailed figures; they had not told me of the detailed figures of how they were going to make the profit; that was none of our business.

"We told the Reagan Round Bale Company that we were able to do this work; we entered into the contract on the 27th day of April; we thought, with the tools we had, and the ones that we were putting in, that we could get it out in sixty days that we had; we said that we were equipped to do that; they knew that; they had sent a man to make an inspection of all the shops in the different cities in the State, I believe; we said that we could make the deliveries in that time; it is not a fact that that is one of the reasons that I gave why they should pay us a better price than they had offered them from the Union Iron Works; we represented that we had a good shop; we naturally would do that; we represented to them by letter, also, that we were able to handle the job."

"Q. Of course you were figuring entirely upon a proposition to deliver at the times stated in the contract; you were not figuring on any earlier or later delivery."

"A. No, sir; we made them a price and agreed to make the delivery as the contract called for; we figured on delivering the sixty presses from the 1st of June up to the 1st of August; that was what

the discussion was there at San Antonio, and that discussion there was more in the nature that we could do the whole job in that time. Mr. Swearingen said he wanted to run it through in batches of five, so as to keep his men around in one neighborhood.

"I testified about their saying that the contract, unless it was given to us, would have to be given to some outside manufacturer, because they considered that we were the only shop in the State that could handle the contract and make the deliveries under contract."

P. H. Swearingen, President of the defendant Reagan Round Bale Company, testified for the defendant:

"The result (of the conferences with Messrs. Carr and Dickson, of the Dickson Car Wheel Company, in February, 1906), was, it was agreed that the Dicksons should make a press according to the drawings we were to have made by Mr. Long in February, and he was to make that press for the purpose of ascertaining the cost on which he could base his bid, and for us to decide the number of presses we could take, because he could not tell the time it would take to make these presses.

"With relation to the Dickson Car Wheel Co. being equipped and prepared to turn out our presses promptly at that time, they persuaded me completely that they were capable of delivering the presses at the time and in the numbers finally agreed upon, and I was guided by their own ideas in making those deliveries and in making that number of presses. Mr. Carr and Mr. John Dickson both made the statement that with the gigs and templets already made, and their shop prepared for it, that they would have no difficulty in getting the presses out much more rapidly than they had gotten out the experimental or the first press. We talked to Mr. John Dickson, Mr. Carr and John Dickson, Sr., and we told them that the presses were for the purpose of being put up in the gin houses, and for the purpose of baling the cotton that could come in during that season of 1906. We told them that the cotton generally came in about the middle of July, or earlier in the southern part of the State, where we expected to put some of the presses. The question as to the date of the delivery of the presses before the 1st of July was fully discussed in our conferences with those gentlemen. We did not want to receive any presses after the first of July, because we thought we could not get into any gin houses after the 1st of July; at that time we expected to have all of the presses prior to that time; it was not advanced to the 1st of July; we subsequently, in making the contract with these gentlemen, extended it thirty days to the 1st of August, when the last presses were to be delivered, because we felt that we could put some of the presses in the northern part of the State where the cotton probably would not open so early. I made those statements to both Mr. Carr and Mr. Dickson. I knew those ginners would not permit us to do the installation work in their gins after the cotton season began, and I explained to them that, in the southern portion of the State, cotton came in about the middle of July, and they certainly agreed with me.

"As we had finally agreed on thirty machines, we had to have a set of mechanics for installing these presses, and we, anticipating, employed six or seven mechanics, believing these six or seven mechanics could get

some experience at the shops assembling the presses, then they could take out the first six presses that came out and install those, which we estimated would approximate ten days, and after getting out the first, then they would take out the next installment, and the next, and so on. We allowed a margin approximately five days for safety. So the time intervening between the delivery of the presses and the opening of the cotton season, or the first installment of presses, was to be devoted to the installation of them. We explained in minute detail to Mr. Carr and Mr. John Dickson, Sr., and I expect we did so to Mr. John Dickson, Jr., but I don't recall just now, as to the revenue and income on the use of these presses we expected to realize, and the source and manner in which we expected to realize it. I explained that the Reagan system was a gin compress, its purpose was to bale the cotton at the gin to a density satisfactory to the transportation companies; we explained to him that this press would not take greater power to operate it than the original square box which was in the gins, and that the ginner himself would furnish the power and the labor for operating this press, instead of operating his square box press, the power being the same practically and the labor less. We explained to him that the package of cotton made by the Reagan system, by reason of its superior density and the ease with which it could be handled, would be preferred as a transportation package. I figured to those gentlemen that we would receive 10 cents per 100 pounds of lint for all of the cotton put into the Reagan bales, from the railroad companies themselves. Boat rebate was about 25 cents. Ten cents amounts to about 25 cents a round bale. The round bale weighs about 250 pounds, and the difference in the tare between the square and the round package, which amounts to about $3.00 a square bale, $1.50 a round bale. There is also a difference of about five cents a bale in marine insurance. Then there is a little rebate in the burlap of about ten cents a bale. Counting everything, there was about $4.50 for every 500 pounds of lint, but we would be compelled to give away a large part of that to the ginners and farmers, to overcome the prejudice and induce them to use our press, and we boiled it all down to a profit, we believe, of about a dollar a round bale; we also told them that we expected to get about three thousand bales, and in our talk with him, we had amassed quite a little fortune.

"In that contract (memorandum contract of April 27th) the date of delivery is from June 1st to August 1st. Nothing was said with relation to that being conditioned upon his ability to get the material. That day we agreed upon five press installments, and the following day, or the day after, I prepared the contract exactly in accordance with the agreement and made those stipulations. Mr. Dickson certainly expressed no doubt about his ability to deliver the presses exactly as the contract was written, and I had absolutely no doubt about it.

"I remember we agreed with Mr. Carr and Mr. Dickson that if we would take five presses on the 1st of June, we should have at least five, or perhaps one or two extra men that knew something about the assembling of these Reagan systems and installing them, to receive those five and begin the installation, after which they would take the next five as they came out, and by the time the fourth installment

came, which was on July 15th, we would have trained enough more men to have enough mechanics to take them after they arrived at the plant and install them.

"In our preliminary agreement we were to have ten presses in June, five on the 1st of June, five on the 15th of June, five on the 1st of July and ten on the 15th of July. That was absolutely agreed on at the time the memorandum contract was made; the reason we didn't put it in was because it took quite a little time to arrange these payments and dates of shipment, and we reserved that to finish up the next day, which I did. I have lived in Texas all my life, and know when the cotton season opens up. I have made a study of that the last two years especially. Cotton don't always come in on the same day in the same community; sometimes it is a month earlier in the same section than other times. At Cuero we have nearly always sold cotton before the middle of July. This year August 1st was about the time it came in, although it was an early season in other parts around there; but, in a general way, we know that the cotton would come in earlier around Kingsville, Goliad and Yorktown than it would at other stations. We anticipated cotton around there about July 1st, around Floresville about the middle, about San Antonio and San Marcos about August 1st, and around Hillsboro we thought cotton would come in probably about August 1st. The manufacturers understood perfectly that we wanted to get in ahead of the cotton. Our first idea was to have the last installment of presses delivered on July 1st, but they could not make them in time and we extended it to August 1st. We had a discussion between ourselves, Messrs. Carr and John Dickson and Mr. Lott and myself, as to the number of presses that they could make and deliver for us in time for the season then coming on—1906. We were willing to take as few as ten and as many as fifty, dependent on what they thought was their ability to deliver them at the times as agreed upon. We finally settled that the proper number would be thirty, as Mr. Carr and Mr. Dickson felt certain they could deliver those thirty at those times and get them out.

"Our men were ready to receive the presses on the 1st of June. We had employed Mr. Reagan long before, Mr. Elmo Lawson had been employed for two months before. Mr. Lawson was to go around and draw the transmission plans and the installation plans, and measure the gins. Mr. Weatherford was employed to go to work the last of May. Mr. Griffin was ready for work prior to the 1st of June. He was sent down to Dickson's May 31st. We had also employed Mr. Hunt for the first of June. We figured that we needed one skilled mechanic at each plant, and he would employ helpers, blacksmiths, carpenters, tinners, and others as he needed.

"All the presses that were delivered were delivered between the 9th of July and the 14th of August, and inasmuch as those twenty-one presses were all delivered between those dates, the six men we had already engaged could not receive the presses, those six men were busy with six presses, and the other presses were going out to be received, and it was absolutely necessary to employ men to receive the presses as they were delivered. That required us to employ as many as twenty men; of course, that late in the season it was a difficult matter to get

the men. Yes, I can give you a tabulated statement showing the expenses of all these men, including their salaries and their expenses, which we paid."

There was other evidence from which the jury might have found that the defendant had sustained damages as alleged by it because of the failure of plaintiff to deliver the presses on the dates named in the contract.

We do not think the evidence before set out presents any issue upon the question of whether time was of the essence of the contract in so far as that question concerns defendant's right under the contract sued on to recover such damage as was reasonably within contemplation of the parties as the probable result of the failure of plaintiff to complete and make delivery of the presses on the dates specified in the contract.

The plaintiffs having agreed to deliver the presses on the dates named in the contract would certainly be liable for any damage sustained by the defendant by reason of its failure to make such deliveries, which reasonably and naturally resulted from such failure or which the evidence shows was reasonably within the contemplation of the parties at the time the contract was made as a probable result of such breach, unless such failure was excused by the other provisions of the contract, or was waived by defendant, or by its acts defendant is estopped from claiming such damage.

The first paragraph of the above quoted charge may not be open to the objection that it submits to the jury the issue of whether time was of the essence of the contract, but when taken in connection with the succeeding paragraph we think it clearly submits such issue. After telling the jury that defendant claims that "time was of the essence of the contract," the charge then proceeds to instruct them that this claim means that plaintiff was advised when it made the contract that a failure on its part to make delivery of the presses on the dates named in the contract would probably cause defendant to suffer the damage claimed by it, and then instructs them that "whether plaintiff knew when the contract was made that unless delivery was made at the times named defendant would likely suffer loss, and whether the plaintiff made the contract in contemplation of such loss of profits by the defendant if it (plaintiff) failed to deliver the systems according to contract, is for you to say from all the evidence." The definition given by the court of what was meant by the defendant's claim "that time was of -the essence of the contract" was inaccurate, but when the jury were told it was for them to determine from the evidence whether the conditions existed which the court instructed them were necessary to make time the essence of the contract, there was a submission of the issue as to whether time was of the essence of the contract. As before said, we do not think any issue of this kind was raised by the evidence. The contract is unambiguous, and plaintiff expressly and explicitly agreed to deliver the presses on the dates named therein, and we think no case can be found in which it is held that in a contract of this kind time would not be considered as of the essence of the contract. The letter of July 7th before set out can not be construed as a waiver of defendant's claim for damages for failure of plaintiff to

deliver the presses on the dates named in the contract. It contains no such waiver in terms, but only waives the right of defendant, which had then accrued, to refuse to accept any of the presses not then delivered, and defendant thereby agreed to accept such of said presses as should be constructed in accordance with the contract and completed. and delivered to it as soon as possible after the date of said letter. We think this is clear from the language used in the letter; but if the language should be held ambiguous, the undisputed evidence as to the circumstances under which the letter was written and the purpose and intention of the writer, which was known to plaintiff, sustains the conclusion that it was not the intention of defendant in writing said letter to waive any claim for damages it might have against plaintiff on account of the failure to deliver the presses on the dates named in the contract.

While there is other evidence in the record raising the issue of waiver and estoppel against defendant, it can not be said that the evidence upon these issues is so conclusive as to render harmless any error in the charge of the court in submitting the issue of plaintiff's liability to defendant for damages.

Under the evidence before set out plaintiff's manager was advised at the time the contract was entered into that defendant expected to make a profit by using the presses during the cotton season of 1906, and such manager knew that a failure to deliver the presses on the dates named in the contract would probably cause defendant to suffer damage through the loss of such profits, and also by reason of increased cost to it in the hire of mechanics for installing said presses. This evidence was undisputed, and it was therefore error for the court to submit to the jury, as an issue, the question of whether the damage claimed by defendant was within the contemplation of the parties at the time the contract was made as a probable result of its breach by plaintiff in failing to make delivery of the presses on the specified dates.

We think both of appellant's objections to the charge before stated are valid, and it can not be said, under the facts of this case, that the error in submitting to the jury issues not raised by the evidence was not prejudicial to appellant.

The memorandum contract of April 29th provides for the delivery of all of the presses before the 1st day of August, 1906. The final contract contains a similar requirement, and expressly names the conditions under which failure to deliver by the time stipulated in the contract shall excuse the plaintiff. Under the terms of this contract we think it clear that unless the conditions existed which excused the plaintiff from making the deliveries on the dates specified in the contract, or unless a compliance with the contract as to the dates of delivery had been waived, the defendant would not have been required to accept and pay for presses delivered after the time named in the contract. (Cook v. Garrison, 96 Texas, 228.) In such case the defendant could waive the right to refuse to accept the presses and receive same, holding the plaintiff responsible for any recoverable damage which the defendant may have sustained by plaintiff's breach of its contract as to the time of delivery of the presses. The waiver of

the right to refuse to accept the presses would not defeat the right to recover damages for the delay in delivery.

There was no error in the refusal of the trial court to give the special charge requested by the defendant before set out, because said charge limited plaintiff's defense to defendant's claim for damages to proof of the alleged agreement to substitute steel tubing for XX pipe, and of the inability of plaintiff to procure said tubing in time to comply with its contract, thus ignoring the other defenses pleaded by plaintiff, as to which, as before stated, the evidence was sufficient to raise an issue.

Appellee very earnestly insists that the loss of profits for which defendant sued was too uncertain and speculative to constitute a basis for recoverable damage, and therefore any error in the charge in submitting to the jury defendant's claim for such damages can not be complained of by defendant. While the testimony offered by defendant upon this claim for damages may have been subject to the objection that the statement of the witness of the number of additional bales of cotton that defendant would have pressed had the presses been delivered on the dates named in the contract, was purely conjectural, no facts being stated from which the estimate of the witness could be made with reasonable certainty, there was other evidence bearing upon this issue which was not subject to this objection. We do not think it can be held that profits of this kind, when the probable amount of such profits can be shown with reasonable certainty and their loss was in contemplation of the parties at the time the contract was made, can not be recovered as damages. The right to recover damages of this kind is sustained by the following authorities: 13 Cyc., 37; Dilley v. Ratcliff, 29 Texas Civ. App., 545; Aultman & Taylor Co. v. Cappleman, 36 Texas Civ. App., 523; Western Union Tel. Co. v. Auslet, 53 Texas Civ. App., 264.

The eleventh assignment of error complains of the rulings of the trial court in sustaining objections of plaintiff to the testimony of the witness Taft offered by the defendant. The matter complained of under this assignment is shown in the following bill of exception:

"Be it remembered that on the trial of the above-numbered and entitled cause, J. Taft was called as a witness for the defendant, and testified that he was in the employ of the Dickson Car Wheel Company in the year 1906, during the time the machines were being constructed for the defendant. Witness stated that he knew there were some undelivered machines now at the plaintiff's shops, and that at the request of Mr. Carr, plaintiff's superintendent, he made certain measurements of several parts of said machine, after having first made a full set of drawings for the auxiliary, and that he made a written report of the result of his measurements to said superintendent, B. M. Carr, about April, 1907, which report was offered and received in evidence, and appears in the statement of facts. The witness then stated that he had had fifteen years' experience in the manufacturing of machinery and as a mechanical engineer, and as a draughtsman and pattern-maker. Whereupon, he was asked the following question by the defendant's counsel: 'Now then, you made an examination of several parts of the machine, concerning which this is a report. Don't

answer this question until these gentlemen have a chance to object. I will ask you to state whether or not, in your opinion, as a mechanical engineer, those machines, as constructed, were constructed in a workmanlike manner, and whether or not the gears would mesh properly, and whether or not the machines would run smoothly, and whether or not the gears were all true and tight, in your opinion.' To which question the plaintiff's counsel objected, because the witness had not shown that he ever saw the sample press of July 7th, which objection was by the court sustained, and said witness was not permitted to answer same, although defendant expected to prove, and would have proved by said witness, that said machines were not constructed in a workmanlike manner, and that the gears on the same would not mesh properly, and that said machines would not and could not run smoothly, and that said gears were not true and tight.

"Before said witness was called to the stand plaintiff's witness had already testified that the twenty-nine machines, including the undelivered machines above referred to by this witness, were all like the sample press of July 7th in every respect.

"To which ruling of the court the defendant then and there excepted, and here now tenders this its bill of exception, and prays that the same may be allowed to become a part of the record in this cause."

We think the trial court correctly held that the letter of July 7th before set out substituted a different warranty for that contained in the contract of May 29th. The only warranty contained in the contract was that the test made at the shops of the plaintiff before the machines were sent out should demonstrate "that the material and workmanship is according to this contract, and that all the fittings assemble properly, all pinions, gears and meshes work properly, and that the entire machine will run smoothly, and that all of the fittings, bearings and packing are true and tight." By the letter of July 7th defendant waived this test in consideration of the agreement by plaintiff to become "responsible for all breaks, defective castings and defective workmanship, and damage caused by said breaks to the system on the first day's run at the several gin houses."

It was further agreed in said letter that the "system" then delivered was completed in accordance with the contract and that the remaining systems should be finished in "exact accordance" with said system. By the terms of this letter the only warranty in regard to the undelivered systems was that they should be finished in exact accordance with the system then delivered, and that plaintiff would be responsible for all breaks and damages caused by defective material or workmanship which occurred during the first day's run at the several gin houses, and it not being shown that the witness Carr had seen the machine delivered on July 7th, he could not know whether or not the nine undelivered presses were finished in "exact accordance" with that system, and his expert opinion as to character of the material and workmanship in said systems was immaterial and inadmissible. If the presses were constructed just as the one delivered on July 7th, defendant could not refuse to accept them because of defective workmanship or material, and its measure of damage for defects of this kind would

be limited to such as occurred during the first day's run at the several gins in which they were installed.

While the contract provides that the defendant should pay the final amount due thereon on or before September 1, 1906, this requirement must be held to have been made with reference to the other provisions of the contract which required delivery of all of the presses by August 1, 1906. It was not contemplated that the presses should be paid for before delivery, and therefore if plaintiff was entitled to recover the contract price of the nine undelivered presses, it would only be entitled to recover interest on said amount from the time said presses were ready for delivery, and unless the evidence showed that the nine presses were ready for delivery before September 1, 1906, interest should not have been allowed from that date.

There was no error in refusing to admit the testimony of the witness, J. L. Norris, to the effect that if there had been no delay in installing defendant's press in his gin he would "possibly" have ginned "a thousand or two" more bales. This testimony was too indefinite and uncertain to form any basis for a reasonable estimate of the number of bales that was lost by the delay, and was therefore properly excluded. On the other hand, we think his statement that the loss in bales was not less than one thousand was not subject to this objection.

The evidence shows that defendant had delivered to plaintiff for use in the construction of these presses certain patterns which belong to defendant and which plaintiff still held in its possession. The court instructed the jury that if they found that the amount due plaintiff under the contract exceeded the amount of damages to which defendant was entitled, that they should make no finding as to the patterns; but if they found that the defendant had sustained damage in excess of the amount due plaintiff, that they should add to such damage the reasonable value of the patterns delivered by defendant to plaintiff. It is difficult to understand upon what theory this charge was based. Appellee's contention is that the charge is correct, because plaintiff, having expended labor on the patterns, was entitled to hold them if defendant was indebted to it until the amount of such indebtedness was paid. If the pleadings support this claim and appellee's contention is sound the judgment should have protected defendant either by decreeing it the patterns or their value, or allowing same to be offset against the amount of plaintiff's judgment, and in order to have done this the jury should have been instructed to find the value of said patterns, regardless of whether the judgment in favor of plaintiff exceeded the amount of damages found for the defendant.

We have not thought it necessary to discuss all of the many assignments of error. What we have said is sufficient to indicate our conclusion upon the main questions presented by the record. If any error is shown in the record which we have not pointed out in this opinion, it is not such as we regard material or as likely to occur upon another trial.

For the reasons indicated, the judgment of the court below is reversed and the cause remanded.

*Reversed and remanded.*