GRAND PRAIRIE GRAVEL CO. et al. v.
JOE B. WILLS CO. (No. 976.)*

(Court of Civil Appeals of Texas.  Amarillo.
June 7, 1916.  Rehearing Denied
Oct. 11, 1916.)

1. CONTRACTS ⟨key⟩10(4) — REQUISITES — MU-
TUALITY.
A contract, whereby defendant agreed to fur-
nish to plaintiff's order a certain grade of gravel
in such amounts as plaintiff should order, not to
exceed 15 carloads daily for 18 months, and to
load and ship as many as 15 cars a day to plain-
tiff when ordered, and under which plaintiff was
to order from defendant all the gravel used in
the conduct of his business and to accept the
maximum of 15 cars per day, entered into when
the defendant's representative knew who the
plaintiff's customers were, and that a part of
them would possibly require as much as 15 cars
per day, and when he knew the extent of plain-
tiff's business, and that it was increasing and
profitable, was not lacking in mutuality.
[Ed. Note.—For other cases, see Contracts,
Cent. Dig. § 37; Dec. Dig. ⟨key⟩10(4).]

2. EVIDENCE ⟨key⟩67(1) — PRESUMPTION — CON-
TINUANCE OF BUSINESS.
Where plaintiff's business has existed for
more than a year, and has steadily increased in
volume, paying a good profit, the court will pre-
sume that plaintiff would continue in business.
[Ed. Note.—For other cases, see Evidence,
Cent. Dig. § 87; Dec. Dig. ⟨key⟩67(1).]

3. APPEAL AND ERROR ⟨key⟩1039(13)—HARMLESS
ERROR—VARIANCE.
In an action for damages for defendant's
breach of its contract to sell and deliver gravel
to the plaintiff in amounts not to exceed 15 cars
per day, overruling an exception on the ground
of variance between the allegation that defend-
ant was obliged to furnish a minimum of 15
cars per day and the contract attached to the
petition as an exhibit, showing that it bound the
defendant to furnish a maximum of 15 cars per
day, was harmless error, since the contract con-
trolled and cured any misdescription of it in the
petition.
[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. § 4086; Dec. Dig. ⟨key⟩
1039(13).]

4. DAMAGES ⟨key⟩40(2)—ELEMENTS—PROFITS.
In an action for the breach of a contract
such loss of profits as were reasonably supposed
to have been in the contemplation of the parties
when the contract was executed, where the
amount thereof can be proven with reasonable
certainty, may be recovered, notwithstanding
they are, in a measure, prospective and specula-
tive, as the injured party must not be deprived
of his remedy because of difficulties lying in the
way of proving his damages.
[Ed. Note.—For other cases, see Damages,
Cent. Dig. §§ 74-78; Dec. Dig. ⟨key⟩40(2).]

5. DAMAGES ⟨key⟩40(2)—BREACH OF CONTRACT—
PROFITS.
In an action for the breach of a contract
to sell gravel to the plaintiff who had a line of
customers to whom he was reselling it, and
whose customers and the price at which he sold
to them were known to the defendant, and
whose volume of business was increasing, the
loss of profits to plaintiff on contracts with his
customers naturally following defendant's breach
of its contract, was within the contemplation of
the parties, and recoverable.
[Ed. Note.—For other cases, see Damages,
Cent. Dig. §§ 74-78; Dec. Dig. ⟨key⟩40(2).]

6. APPEAL AND ERROR ⟨key⟩1053(7)—HARMLESS
ERROR—ISSUES.
No injury could have resulted to the defend-
ant from the court's action in overruling special
exceptions to the paragraphs of the petition,
claiming damages by reason of sales to partic-
ular customers having been prevented, or in the
admission of evidence thereon, where the court
did not submit the issue as to the profit which
plaintiff could have made on sales to those cus-
tomers.
[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. § 4183; Dec. Dig. ⟨key⟩1053(7);
Trial, Cent. Dig. § 977.]

7. DAMAGES ⟨key⟩190—BREACH OF CONTRACT—
PROFITS—EVIDENCE.
In such action, where it appeared that plain-
tiff's customers would have bought gravel of
him as long as he could insure deliveries, and
that they had bought large amounts from him,
and where, after the breach, they bought from
others at a higher price, it was unnecessary for
plaintiff to show that he had a binding contract,
or even a contract with such customers, in or-
der to recover the loss of profits on what he
might have sold to them.
[Ed. Note.—For other cases, see Damages,
Cent. Dig. § 513; Dec. Dig. ⟨key⟩190.]

Error from District Court, Dallas County;
E. B. Muse, Judge.

Action by Joe B. Wills Company against
the Grand Prairie Gravel Company and oth-
ers. Judgment for plaintiff, and defendants
bring error. Affirmed.

Spence & Haven, of Dallas, for plaintiffs
in error. Brooks & Worsham and H. G.
Wills, all of Dallas, for defendant in error.

HALL, J. Defendant in error, plaintiff
below, instituted this suit against Grand
Prairie Gravel Company, a corporation, W.
G. Liggett, E. A. Liggett, and C. C. Houston,
as trustees. Plaintiff alleged that the cor-
poration of the Grand Prairie Gravel Com-
pany, which was organized under the laws
of the state of Texas, had been dissolved, and
that said corporation, through its officials,
had filed with the secretary of state of the
state of Texas, a notice of such dissolution, in
compliance with the statutes of the state of
Texas, and that no receiver had been appoint-
ed for said corporation; that W. G. Liggett,
E. A. Liggett, and C. C. Houston, as officers,
directors, and managers for said corpora-
tion, held the property of such corporation
as trustees for the creditors, and particular-
ly for plaintiff; that The Grand Prairie
Gravel Company, as existing at the date of
the institution of plaintiff's suit, was a Ten-
nessee corporation, with W. G. Liggett as
its president, and that The Grand Prairie
Gravel Company acquired and took posses-
sion of all the assets of Grand Prairie Gravel
Company, and thereby became bound and ob-
ligated in law to assume and discharge all
liabilities of the said Grand Prairie Gravel
Company, and particularly the debt of this
plaintiff; that prior to the second day of
July, 1913, plaintiff was engaged in the busi-
ness of buying and selling gravel in the city
of Dallas and the adjoining territory, and

that the defendant the Grand Prairie Gravel Company was engaged in the business of excavating and selling gravel from its pits near Grand Prairie, Dallas county, Tex., and that on the 28th day of May, 1913, the plaintiff, acting through its president, P. L. Wills, made a certain contract with the defendants, being represented by R. L. Keith, for the purchase of a certain quantity of gravel, said contract to extend over the period of 18 months from its date; and the plaintiff alleged that the original contract had been lost and attached a purported copy thereof as an exhibit. It is further alleged that the said contract was partially complied with by the defendant, and that defendant received large sums of money paid by plaintiff, for gravel delivered to it, and thereby ratified the contract made by said R. L. Keith, for its benefit; that the defendants, through the company's officials, were acquainted with the business in which the plaintiff was engaged, and were fully advised and had actual knowledge of the nature, volume, and extent of the plaintiff's business and of the profits accruing and which would accrue, therefrom prior to the execution of the contract declared upon. In this connection, it is alleged that the defendant's officers and agents knew, prior to the date of the execution of the contract declared upon, that plaintiff was regularly selling and delivering gravel to Sears, Roebuck & Co., to the promoters and owners of Munger Place addition, to the Texas Bitulithic Company, Stone & Webster, the city of Dallas, Tex., State Fair Association, Hughes-O'Rourke Construction Company, S. P. Bewick, Davis Bros., all of the city of Dallas, and to J. F. Wills of the city of Ft. Worth, in large and profitable quantities, and that defendant knew that said parties would purchase from plaintiff gravel in excess of the quantity stipulated in the contract declared upon, and that the profits to be derived from the sale of gravel to said parties were in contemplation of both plaintiffs and defendants at the time of the execution of the contract; that if defendant had delivered gravel to plaintiff under the terms of the contract, plaintiff could and would have sold the said Hughes-O'Rourke Construction Company 30,-000 yards of said gravel to be used in the construction of the Sears-Roebuck building.

Plaintiff further alleged that on the 2d day of July, 1913, plaintiff made demand of the defendant to furnish it with 375 cubic yards of gravel, and at said time explained to the officers of the defendants in charge of defendants' gravel pit that unless said amount of gravel was furnished on said date, plaintiff would suffer great financial loss and damages. It is also alleged that under the written contract plaintiff agreed to pay defendant 45 cents per cubic yard for said gravel, and that had the same been delivered to plaintiff, plaintiff would have sold or delivered the same to its customers at a great profit, and that by reason of defendant's failure to so deliver said property, plaintiff had lost said profit. Plaintiff further alleged that, in addition to its customers hereinabove mentioned, it had other customers in the city of Dallas, and its near vicinity, making daily demand on it for gravel, and that defendants knew that it had these customers and sold to them large quantities of gravel at a great profit. Plaintiff further alleged that its refusal to ship it gravel under the terms of its contract was malicious and that plaintiff was therefore entitled to exemplary damages.

The defendants, Grand Prairie Gravel Company, The Grand Prairie Gravel Company, W. G. Liggett, E. A. Liggett and C. C. Houston, demurred generally to plaintiff's pleading, which general demurrer was followed by 15 special exceptions, the grounds of which are, in substance, as follows:

(1) Because the alleged contract declared upon and set out as an exhibit to plaintiff's pleadings is invalid, in that the same is not a mutual contract, being a contract for the future delivery of personal property and the quantity of such property to be delivered being conditioned upon the will, wish, or want of one of the parties thereto.

(2) Because the plaintiff is not bound or required by said contract to want, desire, or take any gravel, and the taking of any gravel upon the part of plaintiff is wholly optional, and there is no such option provided in behalf of the defendants.

(3) Because the alleged profits which plaintiff would have recovered in each case are too remote, contingent, speculative, uncertain, conjectural, and imaginary, and because there is no averment on the part of plaintiff that plaintiff had binding contracts in any instance with its alleged customers, whereby they, or any of them, were bound to receive the gravel which plaintiff alleges defendant refused to deliver to it.

(4) Because it is not alleged that plaintiff had any binding contract with Sears, Roebuck & Co., nor with Texas Bitulithic Company, nor with Stone & Webster, nor with S. P. Bewick, nor with Davis Bros., nor with Hughes-O'Rourke Construction Company, nor with J. F. Wills, by the terms of which contract any of said parties would have been bound to receive or purchase from plaintiff any specific quantity of gravel.

(5) Because the contract declared upon provided that the plaintiff would accept a maximum of 15 carloads of gravel per day, and hence the said plaintiff had the option to order any amount of gravel up to 15 carloads per day, and was not bound to accept or order any gravel at all.

(6) Of course plaintiff's pleading simply alleges a breach of a contract, and the breach of a contract cannot entitle plaintiff to recover exemplary damages, irrespective of

the motive of the defendants in breach of the contract.

Defendants answered by general denial, and specially denied the execution of the contract declared upon, alleging that it was not executed by the defendants, or any of them, and averred that it was a fabrication and a fraud. They further specially answered that, long prior to the execution of the contract declared upon by the plaintiff, the defendants had entered into a contract with the Texas & Pacific Railway Company, whereby defendants had agreed to deliver to the said Texas & Pacific Railway Company the entire output of its gravel pits for several months, and a portion of the output for a greater period, and that the plaintiff knew of the existence of this contract, and knew that the same was made for the consideration of the Texas & Pacific Railway Company's building a switch track to said pits, and that plaintiff knew that it would be impossible for the defendants to deliver to it any gravel other than the gravel not desired by the Texas & Pacific Railway Company.

The contract upon which the suit is based is as follows:

"May 28, 1913.

"We, the Grand Prairie Gravel Company, of Grand Prairie, Texas, a corporation, duly incorporated, hereby agree with P. L. Wills, of Dallas, Texas, to furnish to his order good and merchantable concrete gravel of a grade passing the specifications of the city engineer, or the commissioners of Dallas, in such amounts as the said P. L. Wills shall order, not to exceed fifteen carloads a day. This agreement is to be held for a period of eighteen months from this date.

"We agree to load and ship as many as fifteen cars a day to the said P. L. Wills, when so ordered and to do this from day to day when so ordered during the said eighteen months, payment to be made for the said gravel on the basis of forty-five cents per cubic yard 3,000 pounds, f. o. b. out pit near Grand Prairie, Texas, as shown by railroad expense bill.

"It is agreed between the parties hereto that we, the Grand Prairie Gravel Company, are not to be held responsible for failure on the part of the railroad company to furnish cars or to transport cars when loaded and billed, to the said P. L. Wills, or for any cause that shall render loading responsible. I, the said P. L. Wills, agree with the Grand Prairie Gravel Company, that so long as my orders shall be filled according to the terms and conditions of this contract, I shall order from the Grand Prairie Company all of the gravel required by me in the conduct of my business, and I agree to order, receive, and accept from the said Grand Prairie Gravel Company, under the terms and conditions of this contract, a maximum of fifteen cars of gravel a day every day during the said eighteen months and to pay on the 15th day of each month for all gravel received during the preceding month, on presentation of bill."

The instrument is signed by R. L. Keith, as manager of the gravel company and by P. L. Wills. (It appears that P. L. Wills, the plaintiff, was doing business under the name of the Joe B. Wills Company.)

The case was tried before a jury and judgment rendered in favor of plaintiff, against the defendants, C. C. Houston, W. G. Liggett, and E. A. Liggett, as trustees, for Grand Prairie Gravel Company, in the sum of $7,500.

[1, 2] The first contention presented under several assignments is that the contract, for a breach of which the action is brought, is one for the future delivery of personal property, and the quantity of such property to be delivered is conditioned by the will, wish, or want of one of the parties thereto; therefore there is a lack of mutuality in the contract, and the same is unilateral and void. As said by Shelby, C. J., in the case of T. B. Walker Mfg. Co. v. Swift & Co., 200 Fed. 529, 119 C. C. A. 27, 43 L. R. A. (N. S.) 730:

"The questions presented by these contentions may not be entirely free from doubt if, in the consideration of the contract, we were confined to what appears in the writing. We are not so confined. We look, not only to the language employed, but to the subject-matter, the course of dealing between the parties, and all the relevant surrounding circumstances. The court is not shut out from the light which the parties enjoyed when the contract was made. In determining the meaning of the words used and the intention of the parties, we place ourselves in the situation of the parties, so as to view the circumstances as they viewed them. In that way we endeavor to get at the correct application of the language to the things described and at the real intention of the parties."

In Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85, 43 N. E. 774, 31 L. R. A. 529, in a contract similar in many respects to the one under consideration, Magruder, Justice, speaking for the court, said:

"The plea avers that defendant was engaged in the purchase, use, and sale of coal in its business, and that its requirements therein for that season were very large, and that such fact was well known to the plaintiff. The parties will be presumed to have contracted with reference to the knowledge which they then had upon that subject, and upon the supposition that appellant would need the same quantity of coal which it had theretofore been in the habit of using. The word 'requirements' evidently has the same meaning as the word 'needs.' The amount of coal which was 'required' for the business of that season was the amount of coal which was 'needed' in the business of that season. If the word 'requirements,' as here used, is so interpreted as to mean that appellee was only to furnish such coal as appellant should require it to furnish, then it might be said that appellant was not bound to require any coal unless it chose, and that therefore there was a want of mutuality in the contract. * * * The rule is that, where the terms of a contract are susceptible of two significations, that will be adopted which gives some operation to the contract, rather than that which renders it inoperative. Thrall v. Newell, 19 Vt. 202, 47 Am. Dec. 682; Evans v. Sanders, 8 Port. (Ala.) 497, 33 Am. Dec. 297. A contract should be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such construction is wholly negatived by the language used. Torrence v. Shedd, 156 Ill. 194, 41 N. E. 95, 42 N. E. 171. It cannot be said that appellant was not bound by the contract. It had no right to purchase coal elsewhere for use in its business, unless, in case of a decline in the price, appellee should conclude to release it from further liability. A contract somewhat similar to the one now under consideration came before this court for construction

in National Furnace Co. v. Keystone Mfg. Co., 110 Ill. 427. The following language, there used, is, with appropriate changes, applicable to the present case: 'We do not regard the contract void on the ground stated. It is true that appellee was only bound by the contract to accept of appellant the amount of iron it needed for use in its business, but a reasonable construction must be placed upon this part of the contract, in view of the situation of the parties. Appellee was engaged in a large manufacturing business, necessarily using a large quantity of iron in the transaction of its business. It is not to be presumed that appellee would close its business, and need no iron; but, on the contrary, the reasonable presumption would be that the business would be continued, and appellee would necessarily need the quantity of iron which it had been in the habit of using during previous years. It cannot be said that appellee was not bound by the contract. It had no right to purchase iron elsewhere for use in its business. If it had done so, appellant might have maintained an action for a breach of the contract. It was bound by the contract to take of appellant, at the price named, its entire supply of iron for the year; that is, such a quantity of iron, in view of the situation and business of appellee, as was reasonably required and necessary in its manufacturing business. Such contracts are not unusual.' "

The circumstances connected with the execution of the contract, according to the testimony of R. L. Keith, who was in charge of plaintiff in error's business, and who executed the contract, are as follows: This witness had signed similar contracts with defendant in error for several years. He was manager at the time two annual contracts were executed, and had been manager since plaintiff in error company began business. He states that during the life of the first contract, and before the second contract was made, he knew that the Joe B. Wills Company was selling gravel to the bitulithic company, and that the bitulithic company was a customer of defendant in error at the time the second contract was executed; that while he did not know about the volume of sales to the bitulithic company during the first year, he knew that appellee sold lots of gravel to said company; that he would often ship defendant in error, for the bitulithic company, 8 or 10 cars. Witness stated that he also knew that during the life of the first contract defendant in error sold lots of gravel to the city of Dallas, as the city was buying in large quantities for use in paving; that the shipments were billed to J. B. Wills Company; that he also knew defendant in error was selling gravel obtained from plaintiff in error to Hughes-O'Rourke Construction Company; also to the Texas State Fair. He was in Joe B. Wills' office one day and he (Wills) told him he wanted 3 or 4 cars per day for the State Fair, and "jumped on him" for not shipping them. He also knew defendant was selling gravel to Roach & Manigan. They were purchasing about all the gravel they could from defendant in error. He also knew before the execution of the second contract that defendant in error was selling gravel to Stone & Webster. · He did not know in what quantities it was being sold to them,

but Stone & Webster were wanting a lot; that he also knew that' defendant in error was selling gravel to the Gilsonite Construction Company and to Davis Bros., contractors, at the fairgrounds. The witness continued as follows:

"Before I made this second contract with Mr. Wills, and later, from my previous relationship with them and business transactions with them, I knew, in a general way, who the customers of Joe B. Wills Company were. I did not have any record or memoranda or anything in my office out there that I could get and see in a general way who had been buying our gravel from the Joe B. Wills Company, and about what quantities; I could not do that. I had something in my office to show that Roach and Manigan and Texas Bitulithic Company had been buying our gravel from the Joe B. Wills Company and also the Texas State Fair. All in the world I had was that he would tell me who to ship it to, but I never looked to them for the money. I would look to Joe B. Wills for whatever he would order, but would ship it to the party he told me to, and from that various memoranda that he gave I could know who was buying our gravel from Wills. I knew prior to the time I made this last contract * * * with reference to the part of the contract where it is agreed by the Grand Prairie Gravel Company that they shall furnish, load, and ship as many as 15 cars a day to P. L. Wills when so ordered, and to do that from day to day during the 18 months. I have a personal recollection as to a discussion that took place between Mr. Wills and myself with reference to the 15 cars, or the quantity of gravel they were to consume. I told him we could not furnish it at all, unless we could get the cars. I would load it if he could get the cars. At that time there was no discussion between Wills and myself as to who were his customers and who would want the gravel and how much they would want. He was telling me the Bitulithic, I believe, were the people who were wanting it so particular. He told me that at the time this contract was made with Stone & Webster and the Bitulithic alone, if they could be furnished that much gravel, they would consume it. He told me they could use 15 cars a day, and I told him we would furnish it if we could get the cars, and could not unless I knew we could get the cars. I furnished gravel to P. L. Wills, or Joe B. Wills Company until Mr. Liggett told me to quit shipping it to them. * * * Of course I knew when I notified Mr. Wills that under the instruction of Mr. Liggett that I could not furnish him any more gravel; that if we furnished him the gravel he would be able to dispose of the 15 cars provided for in this contract."

P. L. Wills, witness for the defendant in error, testified as follows:

"I began to buy gravel from the Grand Prairie Gravel Company as soon as it was incorporated. I bought gravel under a written contract. I represented the Joe B. Wills Company, and Mr. Harston and Mr. Keith acted for the Grand Prairie Gravel Company. We bought gravel from the Grand Prairie Gravel Company about a year before we made the second contract. The terms of both contracts were the same. During the year 1912 I bought all the gravel I used from that company. I was supplying it to the Construction people here in town for street paving and building anywhere I could sell it. The Grand Prairie Gravel Company had orders to send me all the gravel they could ship. All my supply came from there. I was to take all of it from them; that was during 1912. In case I wanted gravel for my customers I would tell them to send it. I conferred with Mr. Keith principally. Mr. Keith knew nine customers out of ten of mine. He would know by going to the

jobs and meeting a number of them personally, as he did in my office a number of times, and by me telling him I had this job or that job. I mean by job, where the work was being done; for instance, on the government bonded warehouse. He went out there. Hughes-O'Rourke was constructing that. He went with me out there. Mr. Keith knew that I sold a lot of gravel for Beaumont and to whom I was selling gravel in larger lots. He knew I was selling to the Texas Bitulithic Company, Stone & Webster and Stone & Webster Engineering Corporation, to Davis Bros., to the Fairgrounds Association, Fred A. Jones Company at Galveston, to the Roach-Manigan Paving Company, to the Gilsonite Construction Company, and to the city of Dallas. The second contract was made in my office with Mr. Keith. I made the contract because I was then arranging for a supply of gravel for 18 months, which I could not have gone into without knowing that I would have the supply. The matter was discussed between me and Mr. Keith. It was discussed before and right up to the time we made the contract."

It appears from the evidence that plaintiff in error experienced more or less difficulty in securing a sufficient number of cars in which to ship the gravel ordered by its customers, and, further, that appellant was bound, under a contract with the Texas & Pacific Railway Company, to deliver to it a certain number of cars per day before it could fill any orders for defendant in error.

The testimony of Keith is that he knew the bitulithic company and Stone & Webster together would possibly require as much as 15 cars of gravel per day. In the light of these facts the contract is open to the construction that the maximum limit of 15 cars per day was written into it for the benefit and protection of appellant, and from which, when so construed, the inference may be fairly drawn that it was not contemplated by either party at the time of its execution that defendant in error would require any less than 15 cars per day; and that by reason of the Texas & Pacific Railway Company's contract taking precedence, and because of the difficulty in procuring cars, plaintiff in error was not willing to undertake to deliver to defendant in error's customers more cars than the limit fixed by its terms.

That the defendant in error had an established business of buying and selling gravel and that appellee was well informed as to the extent of it are facts concerning which there can be little, if any, doubt. The question was not submitted to the jury. The record shows the existence of the business for more than a year; that it was steadily increasing in volume, and since it is shown that appellee was realizing a good profit therefrom, we must presume that he would have continued in business rather than, as insisted by plaintiff in error, he "would pull down his desk, shut up his office, and quit ordering gravel."

In National Furnace Co. v. Keystone Mfg. Co., 110 Ill. 427, it is shown the plaintiff agreed to sell to the defendant all the iron needed in its business for three years at $22.35 per ton, to which defendant assented. The court said:

"We do not regard the contract void on the ground stated. It is true that appellee was only bound by the contract to accept of appellant the amount of iron it needed for use in its business; but a reasonable construction must be placed on this part of the contract, in view of the situation of the parties. Appellee was engaged in a large manufacturing business, necessarily using a large quantity of iron in the transaction of its business. It is not to be presumed that appellee would close its business and need no iron, but, on the contrary, the reasonable presumption would be that the business would be continued, and appellee would necessarily need the quantity of iron which it had been in the habit of using during previous years. It cannot be said that appellee was not bound by the contract. It had no right to purchase iron elsewhere for use in its business. If it had done so, appellant might have maintained an action for a breach of the contract."

In Cold Blast Transportation Company v. Kansas City Bolt & Nut Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696, Judge Sanborn says:

"The rules applicable to contracts of this class may be thus briefly stated: A contract for the future delivery of personal property is void, for want of consideration and mutuality, if the quantity to be delivered is conditioned by the will, wish, or want of one of the parties; but it may be sustained if the quantity is ascertainable otherwise with reasonable certainty. An accepted offer to furnish or deliver such articles of personal property as shall be needed, required, or consumed * * * during a limited time is binding, and may be enforced, because it contains the implied agreement of the acceptor to purchase all the articles that shall be required in conducting his business during this time from the party who makes the offer. Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Minnesota Lumber Co. v. White Breast Coal Co., 160 Ill. 85, 43 N. E. 774, 31 L. R. A. 529; Parker v. Pettit, 43 N. J. Law, 512."

As stated, the contract in the instant case binds the defendant in error to purchase all the gravel required by him in the conduct of his business, and he states that he was making arrangements for gravel to supply customers for 18 months, and that Keith had notice of such fact. As said in Bartlett Springs Co. v. Standard Box Co., 16 Cal. App. 671, 117 Pac. 934, a contract by the terms of which the defendant agreed to sell and plaintiff agreed to purchase certain kinds of wooden boxes, to the extent of plaintiff's demands during the succeeding year, was not lacking in mutuality, because plaintiff was bound thereby to purchase his requirements for the year from the defendant and the defendant was bound to sell upon plaintiff's demand.

Excelsior Wrapper Co. v. Messinger, 116 Wis. 549, 93 N. W. 459, was a case involving a contract which provided that one party should furnish the other whatever paper might be needed at a certain price, to be taken as ordered, the amount named in the contract being the same as had been furnished during the last 12 months. Upon breach of the contract by the seller, upon the ground that it called only for the amount

delivered the previous year, suit was instituted for damages. The defense of want of mutuality was interposed; the seller asserting that it contained no undertaking whatever on the part of the plaintiff, and because, if bound, the contract only required the plaintiff to take such paper as it chooses, and it might, within its terms, refuse to take any. In the discussion, Dodge, Justice, said:

"The first of these grounds of asserted want of mutuality, we think, is wholly contradicted by the very words of the writing which closes with the expression, 'to be taken as ordered,' followed by the signature of the plaintiff. This we have no hesitation in construing to be an undertaking on the part of the plaintiff to take, at the price named, the quantity specified. We, therefore, do not find it necessary to discuss whether an obligation so to do would be implied from the mere signature of a document declaring nothing but the duty of the other party, in analogy to the implication which has been held to arise from a mere 'acceptance' of such an undertaking. Iron Co. v. Topliff, 85 Wis. 513, 55 N. W. 854; McCall Co. v. Icks, 107 Wis. 232, 83 N. W. 300: The latter contention presents a question fruitful of many decisions by courts; the earlier of them tending generally to the view that, where the agreement of one party was to furnish only that which the other party should desire or order or need, there was entire freedom from obligation on the part of the latter, and therefore no mutuality. The principle of these cases has been very lately declared in this court, in Hoffman v. Maffioli, 104 Wis. 630, 80 N. W. 1032, 47 L. R. A. 427; Teipel v. Meyer, 106 Wis. 41, 81 N. W. 982. In later times courts have fully recognized, however, that when the discretion, wants, or needs of a party are referred to, an existing situation, such as an established business or a known enterprise, and intended to be controlled thereby, there becomes added a measure of certainty sufficient to give to the contract mutuality. Thus, an agreement to carry all coal which the other party might desire to have carried in a given period, while wholly uncertain if the other party has no coal, and is engaged in no business or enterprise to regulate his desire to ship, is reasonably certain in the case of a mine owner, the product of whose mines will regulate the quantity which he will need, and therefore be likely to desire, to ship, if the construction be adopted that his option is to be controlled by the course of such business. The underlying principle of this distinction was expressed in McCall Co. v. Icks, supra, where the defendant greed to buy a specified number of all dress patterns which the plaintiff should issue. It being made to appear that the plaintiff was in the business of manufacturing and issuing patterns of various descriptions as the market needs required, it was held that the conduct of the plaintiff's business, although prospective, would give a sufficient measure of certainty as to the number agreed to be purchased to make the contract valid and binding upon both parties. * * * The situation presented in the instant case falls clearly within the principle of the latter decisions. The plaintiff had an established business, of character and magnitude well known to the defendant. It could not, with profit to itself, seriously modify the volume of that business for the mere purpose of increasing or diminishing the amount of any given class of supplies. The exact quantity of paper, therefore, which it would want or need, in that business during a prospective year, while uncertain at the time of the making of the contract, was sure to become reasonably certain in the course of the year; and the contract was merely an optional one with the plaintiff, but bound it as well to take, as it did the defendant to furnish, such paper, of the quality designated, as should be needed for that business. This, under the authorities above cited, constitutes sufficient mutuality to give full validity to the contract, and make either party liable to the other for its breach."

The rule, as stated in 9 Cyc. p. 329, is: "Where, however, the acceptance does really impose any obligation on the acceptor, then a consideration is present and a binding contract results, and this is so wherever the acceptor's freedom of action is in any way limited. It is not limited at all where he simply assents to the seller's offer to sell him all the goods he may order or desire during a certain time, for he has not promised to order any, nor is he bound to do so, but it is limited where the offer is to supply him with all the goods of a particular kind which he may require, or which he may need during a certain time, for here, although it may be that he will neither need nor require any, yet if he does, he has bound himself to buy them of the proposer, and has hence parted with his right to buy them from whom he pleases."

In Warden Coal Washing Co. v. Robt. Meyer, 98 Ill. App. 640, a contract between the parties was evidenced by two letters, as following:

"September 7, 1899.

"Jacob Meyer & Co., Franklin St., Chicago, Ill.—Gentlemen:—Confirming conversation as had with our Mr. Green yesterday, whereby he made you the following price on our Carterville washer coal No. 1, at $2.10; No. 2 at $1.95, prices to remain same, with the understanding that you give us your trade until May 1, 1900, quality of coal to average as good as sample delivered.

"Very truly,          .
          "Warden Coal Washing Company."

The reply to this letter is:

"9/15/1879.

"Ward Coal Washing Co., City—Dear Sirs: We have your favor of the 7th instant and note contents as correct and accept the contract herewith.          Jacob Meyer & Bros."

This contract was attacked for want of mutuality, and after quoting from Minnesota Lumber Co. v. Whitebreast Coal Co., supra, the court said:

"So here it is reasonable to presume, as was said by the court in the above case, that the parties here dealing with one another were practical business men. They were, no doubt, familiar with each other's business, and appellant knew with reasonable certainty what the trade of appellees was. Appellant's letter shows that its Mr. Green had a conversation with appellees, and the correspondence was an outcome of that conversation. We think, in the light of the decisions cited, supra, the contract as it appears from the correspondence is, in substance, that appellant proposed to appellees to furnish them Carterville washed coal No. 1, at $2.10, and No. 2 at $1.95 per ton, in sufficient amount to supply appellees' trade to May 1, 1900, and that appellees agreed to take that kind of coal at the prices named to the extent of their trade until May 1, 1900. We think appellant, by its undertaking, was bound to furnish to appellees the amount of coal their trade required, but no more, at the prices named, and appellees were bound to take the same at said prices. It appears that appellees, between September 15, 1899, the date when the proposition of appellant was accepted by them, and May 1, 1900, ordered coal of appellant which it failed to deliver, and that by reason thereof appellees were obliged to and did buy other coal between said dates, for which they paid $124.90 more than the prices which appellant proposed to furnish it to them for. We

think these facts present a complete defense by way of recoupment to appellant's claim."

That there is some conflict in the decisions with reference to the issues under consideration cannot be denied, and we shall not attempt to reconcile the inconsistencies. A review of the authorities cited by the parties has convinced us that the rules above announced, bearing upon the questions presented under these assignments, is supported by the great weight of authority. Plaintiff insists that the holding of our Supreme Court in H. & T. C. Ry. Co. v. Mitchell, 38 Tex. 85, should control this court in the construction of the contract under consideration. In that case the agreement was evidenced by the following instrument, and the indorsements made thereon:

" 'I propose to cut and place in ricks or stacks, for the H. & T. C. R. W. prairie hay, not to exceed two hundred tons, at points along the line of said road adjacent to the place where the hay may be cut, at twenty-two and one half dollars coin per ton, payments to be made by said company as each twenty-five tons of hay is cut. The above proposition is made for your acceptance or rejection, as agent of the Houston & Texas Central Railway Company. Respectfully, C. S. Mitchell. Approved: Wm. Jenkins.'

"Across the face is written as follows: 'Your proposition is accepted. John E. Garey. The within proposition is accepted for and in behalf of H. & T. C. R. W. Co. Wm. Jenkins, Supt. of Construction.' "

After Mitchell had put up 25 tons, appellant railway company notified him it did not want the hay, and Mitchell, tendering the 200 tons, sued for damages. From a judgment in his favor the railway company appealed, and the Supreme Court held that the contract was not mutual, and that he could recover according to the contract price only for the amount of hay cut and put up by him prior to the time he had been notified by the railway company that they would not accept the hay.

In the absence of evidence showing that the parties had in contemplation, at the time of the execution of the agreement, certain lands from which hay approximating 200 tons had been cut for the railway company the year before, or from which the parties had estimated something near 200 tons could be cut during the contract year to meet certain requirements of the railroad company, and that the company bound itself to buy whatever hay it needed from Mitchell, we think the decision in that case, rendered by what is known as the "semicolon" court, is correct, but no such state of facts is disclosed by the report of that case; nor do we think if Mitchell had refused to comply with the contract, as did the plaintiff in error in this case, and had decided not to deliver any hay, the railway company could have recovered without showing its needs, and that Mitchell was acquainted with them, and, further, that the company was bound under the contract to buy from Mitchell alone.

The principal case relied upon by plaintiff in error is Crane v. C. Crane & Co., 105 Fed. 869, 45 C. C. A. 96. A careful perusal of the facts in this case discloses that the contract, which was verbal, lacks one vital feature, the effect of which is to destroy its mutuality and deprive it of the element of consideration. By its terms it attempts to bind the defendant to furnish to plaintiffs all the dock oak required by them for their use in the Chicago market during the year 1897, but it does not bind the plaintiffs to purchase oak from the defendant alone. The plaintiff was at liberty, under the contract, to buy elsewhere, if the prices of such lumber were more favorable to him, and the defendant would be without remedy. The contract upon which the case of American Agricultural Chemical Co. v. Kennedy & Crawford, 103 Va. 171, 48 S. E. 868, is founded is a nullity for the same reason.

[3] Plaintiff alleged that by the provisions of the contract defendants became bound and obligated to furnish a minimum of 15 carloads of gravel per day. The contract attached to the pleadings as Exhibit A, showed that it bound the defendant to furnish a maximum of 15 carloads per day. A special exception was urged to the petition on account of the variance between the allegations and the exhibit, and was overruled by the court. This constitutes harmless error. The contract, when attached to and made a part of the petition, as an exhibit, controls and cures any misdescription of it in the pleading. Beham v. Ghio, 75 Tex. 87, 12 S. W. 996.

[4] Plaintiff in error attacks the recovery with great vigor because the damages represent lost profits. Whatever may have been the ancient rule, the right to recover, as damages for the breach of a contract, such loss of profits with reference to either party is well settled in modern practice. If it be shown that the last profits were reasonably supposed to have been within contemplation of the parties when the contract was executed and the amount thereof can be proven with reasonable certainty, a recovery of the full amount should not be denied because they may be, in a measure, prospective. In their nature, profits are more or less conjectural or speculative, but the injured party must not be deprived of his remedy because of difficulties lying in the way of proving his damages.

[5] The damages claimed here are, in our opinion, such as would naturally be expected to follow a breach of the contract by the gravel company; and, since the manager of the company was familiar with Wills' line of customers, and knew the price at which the gravel was being purchased by Wills and sold, we conclude that the profits were within the contemplation of the parties when the agreement was made. Under the pleadings and proof there were no special circumstances affecting Wills' right to compensation of which the company was ignorant, and the amount of the injury was a question for the jury. The company knew the volume of

Wills' business; that it was well established and was steadily increasing, and the damages awarded seem to us to be such as have naturally resulted from the breach of the contract. Because the anticipated profits were to accrue from collateral agreements between Wills and the users of the gravel does not affect his right, for the reason that the company had the requisite notice, for more than a year prior thereto, of the extent of his business. In American Construction Co. v. Caswell, 141 S. W. 1013, these principles were applied in the case of a tort, and Caswell was permitted to recover for the loss of profits on goods which he probably would have sold but for the act of the construction company in obstructing the entrance to his storehouse and shutting off light and air from his place of business, rendering the same dark, hot, and uncomfortable, and diverting travel from in front of the store. In a well-considered opinion, Judge Jenkins said:

"Plaintiffs were conducting a well-established business, and their trade fell off from the 1st of March to the trial of this case, September 12-16, 1910, and their losses in profits, which the evidence indicates they otherwise would have made, were equal to the amount of the judgment in their favor. This loss of trade did not arise from trade conditions; the trade in the city of Austin for 1910 being as good as it was in 1909. Nor did it arise from decrease of stock carried by appellees. In fact, the evidence indicates to a reasonable certainty that the decrease of appellees' business, and consequent loss of profits, was due solely to the obstructing of travel, caused by the erection and maintenance of said fence. The principal issue in this case is as to whether loss of profits occasioned by the erection of said fence is the proper element of damage. Appellant contends that damages on account of loss of profits are not recoverable in any case. The courts of this state hold to the contrary."

In Springer v. Riley, 136 S. W. 577, bearing upon the question of the degree of proof necessary to entitle the plaintiff to recover for loss of profits, Judge James said:

"Reasonable certainty is all that is necessary. The testimony introduced for the purpose of showing what crops would have been produced by defendant on this land was by comparison with what other like land in the neighborhood produced that season."

Judge Neill said, in Fraser v. Mining Co., 28 S. W. 715:

"But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to the amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. * * * The rule that damages which are uncertain or contingent cannot be recovered does not embrace an uncertainty as to the value of the benefit or gain to be derived from the performance of the contract, but an uncertainty or contingency as to whether such gain or benefit would be derived at all. It only applies to such damages as are not the certain result of the breach, and not to such as are the certain result, but uncertain in amount."

It would be a useless consumption of time and space to quote further from the authorities in this state. The principles announced are too well established by repeated decisions to require further discussion by us, and we refer merely to the following cases, cited by defendant in error: Calvit v. McFadden, 13 Tex. 326; Railway Co. v. Hill, 63 Tex. 381, 51 Am. Rep. 642; Railway Co. v. De Groff, 102 Tex. 433, 118 S. W. 134, 21 L. R. A. (N. S.) 749; American Construction Co. v. Caswell, 141 S. W. 1013; Walter Box Co. v. Blackburn, 157 S. W. 220; Springer v. Riley, 136 S. W. 577; Carrico v. Stevenson, 135 S. W. 260; Reagan Round Bale Co. v. Dickson Car Wheel Co., 55 Tex. Civ. App. 509, 121 S. W. 526; Aultman Taylor Mch. Co. v. Capleman, 36 Tex. Civ. App. 523, 81 S. W. 1243; Dickinson Creamery Co. v. Lyle, 130 S. W. 904; King v. Griffin, 39 Tex. Civ. App. 497, 87 S. W. 844; Pitman v. Block Queensware Co., 106 S. W. 724.

[6] The court did not submit to the jury the issue as to the amount of profits which Wills might have made upon the sales to Hughes-O'Rourke Construction Company, Sears & Roebuck, and to Davis Bros. Therefore no injury could have resulted to plaintiff in error from the court's action in overruling special exceptions to the paragraphs of the petition claiming damages by reason of such sales having been prevented, nor in admitting evidence bearing upon such issues.

[7] Under several assignments, plaintiff in error complains of the action of the court in admitting testimony of plaintiff's witnesses to show what gravel he might have sold to different firms, corporations, and contractors, the objection being that the profits which might have been made were too remote, contingent, and conjectural, and for the further reason that it was not shown that plaintiff had a binding contract to furnish such parties gravel at the time of the breach. The undisputed evidence showed the purchase price per cubic yard of the gravel, the cost of transporting the same to the various customers. The customers themselves were produced, and testified that they bought gravel of Wills as long as he could insure deliveries; that they would have continued to purchase of him if he had been able to make deliveries, and they further show the amount they actually purchased during the life of the contract. It appears, further, in nearly every instance that they purchased similar gravel in definite amounts, either at the same or a greater price than they would have paid if they had purchased from Wills. Many of them had been customers, to whom Wills had sold large amounts of gravel in the past. Such being the evidence, we think the proof was clearer and more conclusive than in several of the cases cited above. Wills had an established business. These parties were his regular customers, and the only inference to be drawn from their evidence is that they would have continued to patronize him. Under such conditions, in our opinion, it is unnecessary for Wills to show that he had a binding contract, or even a contract, with such customers, nor

do we understand the authorities to so hold, except in cases where there is no established business and the evidence discloses simply one transaction of purchase upon the one part and sale upon the other.

There is nothing in the record to indicate that the verdict of the jury is the result of passion and prejudice; nor are we prepared to say that the verdict is excessive.

Finding no reversible error, the judgment is affirmed.