**PITTSBURGH ATHLETIC CO. et al. v.
MALIN.**

No. 4223.

Court of Civil Appeals of Texas. Amarillo.
May 7, 1934.

Rehearing Denied May 28, 1934.

Cooper & Lumpkin, of Amarillo, for appellants.

Shannon, Ochsner & Pheiffer, of Amarillo, for appellee.

HALL, Chief Justice.

The appellee Malin sued the Pittsburgh Athletic Company and the Chicago White Sox for the breach of an alleged tripartite contract by the terms of which the two baseball teams were to play a matched game in Amarillo on April 5, 1933, the game to be advertised and promoted by plaintiff, for which plaintiff was to receive 20 per cent. of the gate and grand stand receipts and the remainder to be paid to the defendants. He alleges that the appellants refused to play the game, to his damage in the sum of $1,300.

A trial to a jury resulted in a verdict and judgment in appellee's favor in the sum of $978.27.

Plaintiff alleges that the contract resulted entirely from correspondence between the parties. The appellants contend that the letters evidencing the negotiations do not create a contract. This presents a question of law.

We give the substance of the letters as follows: September 9, 1932, J. L. Comiskey, president of the Chicago White Sox organization, wrote the Chamber of Commerce of Amarillo that his organization and the Pittsburgh baseball clubs were endeavoring to arrange a return schedule of games en route from their training camps in California during the spring. He stated that they were practically certain of playing in El Paso and that they had an available date on Wednesday, April 5th, at which time they could play in Amarillo on a basis of 80 per cent. of the gross gate and grand stand receipts to the Pittsburgh and Chicago clubs and the balance of 20 per cent. to those who were to handle the game in Amarillo. That the 20 per cent. would cover all expenses for conducting the game, such as park rent, tickets, ticket sellers, ticket takers, umpires, and all incidental expenses. This letter was handed to plaintiff Malin by the Chamber of Commerce, and on October 3d he wrote to Comiskey stating in substance that Amarillo was a splendid sports town and believed that the appearance of the two clubs would draw a capacity crowd. That the only available park is one which would accommodate around 2,500 fans with the erection of temporary bleachers. That he would like to contract with them and promote and handle the game here. He further stated: "I have already contacted the owners of the park and can assure you I can handle the bal-

lyhoo and advertising in a way that will get results. While I think the eighty per cent is a bit steep, I will agree to it for I would like to get games of this nature started here. We have splendid hotel accommodations here and a population of 50,000." In reply to that letter Comiskey wrote Malin on October 6th, stating, in part: "Tentatively we will go along with the date in Amarillo and we may increase it to two dates. Do you think two days would be worth while? Will keep you posted and fully advise you should there be any change so that you will have ample time for advertising, etc." On December 3d Comiskey wrote Malin stating that he had just returned home from California and found a letter awaiting him from the president of the Topeka baseball club asking about exhibition games in Amarillo and Topeka, and further stated: "I conveyed to him the information that the Amarillo matter had been closed and that I had some correspondence with you regarding same. Would like to know how conditions are in Amarillo and how everything is coming along. The day we will play in Amarillo will be Wednesday, April 5th. We are trying to contact with someone in Phoenix to handle a game there Monday, April 3rd." He further stated he had written the Chamber of Commerce there but had received no reply. On December 20th Comiskey wrote Malin stating that he had written on December 3d and had heard nothing from Malin, further saying: "Would like to hear from you as everything is all set for Chicago and Pittsburgh to play in Amarillo in accordance with our conversation for the date of Wednesday April 5, 1933. Was unsuccessful in doing anything at Phoenix. Have you any idea where a ball game would draw well on the Southern Pacific R. R., between Los Angeles and El Paso that would permit us to play Monday, April 3rd?" On December 22d thereafter Malin wrote Comiskey: "Everything is all set for the Sox and Pirates to play here on April 5th. If you can I wish you would supply me with some advance stories on the White Sox personnel, character sketches, and such, beginning some time in February." He further suggested Tucson as the only town he could think of in Arizona and stated that he was not personally acquainted with anyone there. Replying to this letter, Comiskey wrote Malin on December 27th saying he was delighted to hear that everything was getting along fine and in first class shape with reference to the Pittsburgh-Chicago game in Amarillo on April 5th. He further stated that he was inclosing some data on various players of the White Sox and request-

ed Malin to write Henry Edwards, who was in charge of that bureau, whenever he wanted any data on players. He promised to send pictures, later on, of the various better-known players of his club. Thereafter on January 20, 1933, Comiskey wrote Malin that the Chicago club was making hotel arrangements for both the Pittsburgh and Chicago clubs on their return route from the Pacific Coast and planned to arrive by special train in Amarillo at 8:05 o'clock a. m., Wednesday, April 5th, leaving the same day at 9 o'clock p. m. He asked Malin to secure hotel rates in the best hotel and have the landlord to write him at once in duplicate. He further stated that each club would require six or seven rooms with baths and ample taxi service from the depot to the hotel and then to the park and return and to the depot on their departure. He further stated: "I hope we will have a nice day in Amarillo and I know the fans will be well pleased with the exhibition and we will send pictures of our players in ample time for newspaper use." Malin wrote Comiskey that he had asked the Herring Hotel for special rates, leaving it up to the hotel men to secure taxi service. On January 27th Comiskey acknowledged receipt of this letter. On February 14th thereafter Comiskey wrote Malin that they were sending him under separate cover photographs, etc., of the ball players, for newspaper use, and on February 18th S. E. Waters, vice president of the Pittsburgh Athletic Company, wrote Malin that under separate cover he was mailing a lot of press stories and "mats" for use in advertising the game to be played against the White Sox in Amarillo.

On May 9, 1932, William E. Benswanger, president of the Pittsburgh Pirates, wrote Harry M. Grabiner, vice president of the American League Baseball Club of Chicago, as follows: "Referring to our telephone conversation of Saturday, would say that we would be pleased to make the trip from the coast east with your club provided the Chicago Cubs are not counting on us to do so in 1933. Will you be good enough to inquire from Mr. Veeck as to whether he expects us to come east with them, as if he does we feel we should do it in view of past seasons. In other words, the Cubs would have first claim to the return trip with us, but in the event that they do not wish to do so, we will gladly make the trip with the Sox. Your cooperation in the matter will be appreciated and your further advices welcome." On August 26, 1932, Benswanger wrote Geo. F. Simpson of El Paso saying: "We have your letter of the 22nd and are sending a copy of same to

the Chicago White Sox with whom we expect to travel east next spring. No doubt you will hear from them if the trip can be arranged in coming via El Paso." On September 8, 1932, Comiskey wrote Benswanger acknowledging the latter's letter of the 3d inst., and said: "We are taking up the matter of games with Phoenix, El Paso, Amarillo, Tulsa, and Kansas City, and have asked them for eighty per cent of the gross gate and grand stand receipts for the Pittsburgh and Chicago clubs and the twenty per cent balance to whomever handles the game, which would cover expenses of all kinds for the conduct of the same." On September 12, 1932, Benswanger wrote Harry Hagedon, president of the El Paso baseball club, saying: "Replying to yours of the 7th inst., would suggest that you communicate with the Chicago White Sox with whom we will travel east from California next spring. We already have an offer from El Paso and if you will communicate as suggested an arrangement might be worked out whereby both the White Sox and the Pirates may play in El Paso."

On October 6, 1932, Grabiner wrote Benswanger acknowledging the receipt of the latter's letter dated the 4th inst., stating that he had heard from Amarillo regarding the date there on a basis of 80–20, stated that he had made arrangements with Simpson, and further: "This practically closes Amarillo, and El Paso." On October 12th Benswanger wrote Grabiner that he had closed with the Tulsa club for a game between the White Sox and Pirates at that place on April 6th. October 19th Grabiner wrote Benswanger in part as follows: "Subject to your approval have outlined the following return trip of the Chicago and Pittsburgh clubs: Monday at Phoenix; Tuesday, El Paso; Wednesday, Amarillo; Thursday, Tulsa; Friday, Topeka. All of the above towns are within a night's railroad ride of each other and I believe can be included in the regular return route of the all year winter tourists, eliminating any side rides or extra railroad expense. Have received confirmation from El Paso, Amarillo, and you have taken care of Tulsa." On December 20, 1932, Grabiner wrote Benswanger that he was inclosing railroad schedule showing departure and arrival on the various roads to be used in the return trip. On December 21st Benswanger wrote Grabiner in reply to the foregoing letter approving the railroad schedule and stating that the Tulsa game was set for April 6th.

■ It is unnecessary to cite authorities or discuss the foregoing correspondence for the purpose of demonstrating that a contract complete in every particular had been consummated between the plaintiff Malin and the two defendants, and we overrule the first proposition which challenges the court's action in not sustaining the defendants' general demurrers. They show that the minds of all parties had met upon the essential terms of the contract.

■ The Pittsburgh Athletic Association contends that because the plaintiff failed to set out the correspondence between Comiskey of the White Sox and Benswanger of the Pirates and was only able to set out a letter received from Waters, an officer of the Pirates organization, in which he sent certain advertising matter, that the petition showed no right to make the Pittsburgh Company a party to the suit for the reason that the allegations did not show that it was a party to the contract.

The series of letters which passed between Comiskey and Benswanger established the facts beyond controversy. The general rule is that plaintiff is not required to make specific allegation of facts which are peculiarly within the knowledge of the defendants and in such cases a general allegation is sufficient. South Plains Coaches v. Behringer (Tex. Civ. App.) 4 S.W.(2d) 1003; Id. (Tex. Com. App.) 13 S.W.(2d) 334.

In addition to the correspondence between Benswanger and Comiskey and the letter of Waters sending the advertising matter to Malin, it was shown that the Pittsburgh Company accepted the schedule and routing for both clubs proposed by Grabiner of the White Sox, which included the date at Amarillo. As a further fact showing ratification by the Pittsburgh Company and a practical construction by it of the terms of the contract, they appeared in Amarillo on the appointed day in company with the White Sox and did not decide to breach the contract until about noon of that day.

■ The plaintiff's petition sets out in hæc verba Comiskey's letter to the Amarillo Chamber of Commerce of September 9th, supra, and alleges that the letter was handed to Malin, who replied thereto and offered to promote the game to be played on April 5th between the two teams upon the terms and conditions stated in Comiskey's letter. That subsequently Comiskey, "acting for both of the defendants herein," wrote additional letters to the plaintiff whereby plaintiff's offer was accepted. That it was agreed by and

between each of the defendants and plaintiff that the clubs would play an exhibition game in Amarillo on April 5th and that plaintiff would handle and act as the promoter of the game. That defendants should jointly receive 80 per cent of the gross gate and grand stand receipts and plaintiff should receive 20 per cent. thereof. Plaintiff sets out Vice President Waters' letter in hæc verba, and we think these allegations are sufficient as against the exceptions urged. When a contract is evidenced by letters or telegrams, it is not necessary to set out the correspondence in full, and as a general rule of pleading based upon a written instrument it is sufficient if the plaintiff claiming damages for breach sets out the legal effect of the contract and such terms of the contract as have been breached and out of which his cause of action arises. Reliance Insurance Co. v. Smith (Tex. Civ. App.) 44 S.W.(2d) 446; Steel By-Products Company v. Vernon Cotton Oil Co. (Tex. Civ. App.) 257 S. W. 613; 10 Tex. Jur. pp. 494–498.

■ By appropriate propositions the appellants contend that if Malin is entitled to recover at all, his recovery should be limited to 20 per cent. of the amount to be realized from a sale of tickets to 2,500 fans.

This contention is based upon Malin's statement in his letter of October 3d to Comiskey in which he said: "The only available baseball park is one that would accommodate around 2,500 fans with the erection of temporary bleachers. This could be done handily." This statement is in no sense a part of the contract. It is merely an estimate by Malin of how many baseball fans could be assembled inside the park with the erection of temporary bleachers. He does not bind himself to erect the bleachers, nor does he guarantee that 2,500 fans would purchase tickets and attend the game. In that same letter he represents that Amarillo has a population of 50,000 people. While it is commonly known that at that time Amarillo did not have that many people, Malin would in no sense be bound by that statement. These assertions, like his further statement that Amarillo served a large territory and that the appearance of the Sox and Pirates would be a big boost to baseball in this section, are the expressions of his opinion and are mere matters of inducement. If they were untrue and had been relied upon by the defendants, by proper pleadings their truth or falsity and the effect thereof might have been made issues in the case.

As stated in 1 Page on Contracts, § 221:

"Each of the subjects of fraud, misrepresentations, mistake and non-disclosure, must be considered with reference to its point of contact with the contract. Each of them may: (1) concern some one of the essential elements of the contract; or (2) concern some collateral, though often material matter which may involve the qualities or characteristics of the subject of the contract or of the parties thereto or which may involve some external fact which may nevertheless operate as an inducement to the contract."

In discussing essential No. 2, the author further said: "On the other hand the party to the contract may understand the identity of the adversary party, the consideration, the subject-matter and the terms of the contract and may be willing to enter into such contract. His willingness so to enter may, however, be due to an erroneous belief that some collateral though possibly highly material matter which may involve the qualities or characteristics of the subject-matter or which may involve other facts which nevertheless operate as the inducement to the transaction and as the motive for entering into it. This erroneous belief may be caused by fraud, misrepresentation or non-disclosure. For the lack of a better term, this may be said to affect a matter of inducement. Such a contract is never void."

In Buckler v. Kneezell (Tex. Civ. App.) 91 S. W. 367, which involved the right of an architect to recover for services rendered, it was held that where he alleged that at decedent's special instance and request and in accordance with his directions, plaintiff prepared complete plans for a three-story building to be erected by deceased, the estimated cost of which was $40,000, that part of the allegation with reference to the cost of the building should be construed as a mere allegation of the estimate of the cost and not as an allegation that the building which plaintiff was employed to make plans for was one that was to cost such sum.

■ The estimates made by Malin of the number of spectators which the park would hold and of the number of people constituting the population of Amarillo did not bind him to provide that many people or seats for them in the park nor to furnish a town with 50,000 people in which the game was to be played and they are in no sense stipulations in the contract and therefore furnish no basis for the recovery by Malin of compensation. Simkins, Contr. & S. 271, 275.

In response to special issue No. 4, the jury found that it was reasonably contemplated by

plaintiff and defendants that plaintiff was entitled to profits, if any, realized from the sale of refreshments and confections during the game, if it had been played. That net profits would have accrued as the result of such sales in the total sum of $150. The appellants attack this item upon the ground that it is special damages and that the defendants had no notice and would not be bound thereby.

With reference to it, the plaintiff alleged: "And plaintiff further alleges that it was reasonably contemplated between the parties that plaintiff should arrange for the distribution and sale of refreshments and confections during the game and that all profits from such sale of refreshments and confections should belong to this plaintiff."

In the case of Hadley v. Baxendale, 9 Exch. 341, 5 English Ruling Cases, 502, the rule was declared that: "Damages recoverable for breach of a contract are such as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as a probable result of the breach of it." 8 R. C. L. 455, § 25.

This rule has been adopted in most of the states and especially in Texas. 6 English Ruling Cases, 625; Stuart v. Western Union Telegraph Co., 66 Tex. 580, 18 S. W. 351, 59 Am. Rep. 623; San Antonio Paper Co. v. Morgan (Tex. Civ. App.) 53 S.W.(2d) 651; Grand Prairie Gravel Co. v. Joe B. Wills Co. (Tex. Civ. App.) 188 S. W. 680; National Bank of Cleburne v. M. M. Pittman Roller Mills (Tex. Com. App.) 265 S. W. 1024, 36 A. L. R. 1405.

In 6 Page on Contracts, § 3187, the author says: "The law allows all damages which may reasonably be presumed to have been within the contemplation of the parties when they made the contract. Accordingly if special circumstances out of the usual course of things are known to both parties and they contract with reference thereto, the damages which follow breach and are occasioned by such special course of things, must be awarded to the party not in default as compensation." Citing numerous cases.

The contract specifically sets apart 80 per cent. of the gross gate and grand stand receipts only to the defendants. The record shows that Malin secured and had delivered at the baseball park refreshments and confections for sale and distribution during the progress of the game and hired employees to distribute such refreshments through the crowd. Benswanger, president of the Pirates, testified by deposition in part as follows: "It was our understanding that advertising of the exhibition (if any advertising, as we directed none and asked for none) the sale of programs and confections should be handled solely by the local promoter. Such things (peanuts, pop corn, cold drinks and other confections) are sold at Forbes Park in Pittsburgh but this by no means establishes a standard for others. This is purely an incidental means of increasing the revenue for the local promoter and the visiting clubs never share in it. No matter how much Malin took in on such items, it would not have accrued to us in any way. Neither do our concessions at Forbes Field accrue to us, as they are leased to others." Malin testified with reference to his experience in promoting games of this character, and said there was a custom in baseball circles concerning the sale of refreshments such as soda pop, candy, cigarettes, pop corn, peanuts, and the like during the game; that it was the universal custom wherever baseball is played. That so far as he knew, refreshments and confections were never handled by the participating teams, but are handled by the promoter and the persons who own the park. Cal Farley, who qualified as an expert in such matters, testified that it was customary to have such concessions at exhibition games. That under a contract like the one in this case, the money received at the gate and for grand stand and box seats would belong to the clubs. That the clubs are not interested in how many peanuts, etc., are sold, but how many people are going to pay to see the two clubs play ball, and that the promoter usually gets the receipts from the concessions.

Under the pleadings and proof, we think the appellee was entitled to a judgment for the amount which the jury found would have been received for confections and refreshments. Restatement, Contracts, § 330, Tex. Annot. § 330; Western Union Tel. Co. v. Linn, 87 Tex. 7, 26 S. W. 490, 47 Am. St. Rep. 58; Missouri, K. & T. Ry. Co. v. Belcher, 89 Tex. 428, 35 S. W. 6; Andrus v. Hornsby (Tex. Civ. App.) 238 S. W. 314 (writ of error refused); 13 Tex. Jur. 75, § 8, 86, § 17; 17 C. J. 742, §§ 76, 77; 1 Sutherland on Damages, §§ 14, 45, 46, 50, 51.

We find no reversible error, and the judgment is affirmed.